IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-01694-PAB-MEH

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL #111,
DOMINGO N. MERENO,
DAVID L. WILLIAMS,
GUY E. FORTI,
GERALD E. KING, and
VICKI WILLIAMS,

       Plaintiffs,

v.

PUBLIC SERVICE COMPANY OF COLORADO, and
XCEL ENERGY INC. EMPLOYEE WELFARE BENEFIT PLAN, a/k/a The Public
Service Company and Participating Subsidiary Companies Retirees' Medical Managed
Care/Medicare Coordinated Plan,

       Defendants.

_____

**ORDER**

_____

This matter is before the Court on Plaintiffs' Motion for Judgment on the

Pleadings and on First Claim for Relief, and Motion to Stay Proceedings Pending

Arbitration [Docket No. 20] filed by plaintiffs International Brotherhood of Electrical

Workers, Local #111 ("IBEW"), Domingo N. Mereno, David L. Williams, Guy E. Forti,

Gerald E. King, and Vicki Williams (collectively, the "Class Representatives").  The

Court's jurisdiction is based on 28 U.S.C. § 1331.

## I. BACKGROUND

The following facts are undisputed.  Prior to June 1987, defendant Public Service

Company of Colorado ("PSCo") paid the healthcare premiums of both its active

employees and its retirees.  Compl. [Docket No. 1] at 4, ¶ 16; Answer [Docket No. 16] at 5, ¶ 16.  In June 1987, a cost-sharing plan went into effect for active employees, but PSCo continued to pay the healthcare premiums of employees who retired prior to the expiration of the 1986 collective bargaining agreement ("CBA").  *Id*.  In 1989, PSCo implemented a managed healthcare plan for active employees and entered into negotiations with IBEW to determine the impact that the managed care plan would have on retirees.  Docket No. 1 at 5-6, ¶¶ 18-22; Docket No. 16 at 6-8, ¶¶ 18-22.  The negotiations resulted in an August 23, 1989 Letter of Agreement ("LOA"), which gave employees retiring in 1990 a choice of plans, had no impact on individuals who had already retired, and provided that PSCo would pay retirees' healthcare premiums. Docket No. 1 at 5-6, ¶¶ 22-23; Docket No. 16 at 7-8, ¶¶ 22-23.

On September 20, 1989, the parties met to negotiate a new healthcare plan for retirees.  Docket No. 1 at 6, ¶ 24; Docket No. 16 at 8, ¶ 24.  The result of this negotiation was reflected in the 1989-1992 CBA and a Letter of Understanding, which states: "Future retirees under age 65 and eligible dependents under age 65 will, upon retirement, have the same medical plan as active employees . . . .  Future plan changes in the Managed Care plan for active employees will also be reflected in the retiree plan for individuals under age 65."  Docket No. 1 at 7-8, ¶ 27; Docket No. 16 at 10, ¶ 27; Docket No. 1-11 at 1-2.

In August 1992, the parties entered into negotiations over the successor CBA, during which time they discussed, among other issues, healthcare premium cost-

sharing for active employees.[1]  Docket No. 1 at 8, ¶ 31; Docket No. 16 at 12, ¶ 31.

With respect to retiree healthcare benefits, the 1992-1995 CBA states: "[f]or the term of

this Agreement . . . .  Retirees and future retirees and their dependents [sic] monthly

premium amount will be based on the same percentage and in the same manner as

was agreed to in the 1989 negotiations."  Docket No. 1 at 9, ¶ 34; Docket No. 16 at 12-

13, ¶ 34; Docket No. 1-18 at 3, § 3(a).  The CBA established a new premium cost-

sharing schedule for active employees, but did not alter the percentage paid by current

or future retirees.  *Id*.  There were no relevant changes in retiree health benefits

between 1995 and 2003.  Docket No. 1 at 10, ¶¶ 38-39; Docket No. 16 at 14-15, ¶¶ 38-

39.

      The 2003-2006 CBA implemented a new premium cost-sharing schedule for

future retirees.  Docket No. 1 at 10, ¶ 40; Docket No. 16 at 15, ¶ 40; Docket No. 1-22 at

3, § 3(d).  The 2003-2006 CBA also added the following language to the section on

medical insurance: "[f]uture plan changes in the Managed Health Care Plan will also be

reflected in the retiree plan for individuals under age 65.  These changes do not affect

the medical coverage of retirees with Medical plans other than [the managed healthcare

plan or Medicare ("M/M")]."  Docket No. 1-22 at 2-3, ¶ 3(a).  The 2006-2009 CBA

implemented an increase in all co-payments for active employees and future retirees.

Docket No. 1 at 11, ¶ 42; Docket No. 16 at 15-16, ¶ 42; Docket No. 1-23 at 4, § 3(b).

The 2009-2014 CBA did not make any relevant changes to healthcare benefits for

---

[1] Plaintiffs allege, and defendants deny, that during this session they also discussed the impact that this change would have on current retirees.  Docket No. 1 at 8, ¶ 31; Docket No. 16 at 12, ¶ 31.

current retirees.  Docket No. 1 at 10-11, ¶ 41; Docket No. 16 at 15, ¶ 41; Docket No. 1-24 at 4, § 3(a).

In October 2011, PSCo announced an increase in prescription drug co-payments that would apply only to current and future retirees, but not to active employees. Docket No. 1 at 12, ¶ 47; Docket No. 16 at 17, ¶ 47; Docket No. 1-28.  On October 13, 2011, IBEW brought a grievance against PSCo, alleging that PSCo breached the CBA by unilaterally increasing prescription drug co-payments for retirees without making a corresponding change to the healthcare plan for active employees.  Docket No. 1 at 12, ¶ 49; Docket No. 16 at 18, ¶ 49; Docket No. 1-30.  PSCo argued that the dispute was not subject to the CBA's grievance and arbitration procedure.  *Id.*; Docket Nos. 1-31, 1-32.

On April 20, 2012, IBEW made a formal demand on PSCo to submit the matter to arbitration.  Docket No. 1 at 13, ¶ 51; Docket No. 16 at 18-19, ¶ 51; Docket No. 1-33. PSCo maintained that there was no contractual violation, that disputes regarding the benefits of future retirees were not ripe, and that the benefits of current retirees were not subject to arbitration.  Docket No. 1 at 13, ¶ 53; Docket No. 16 at 19, ¶ 53; Docket No. 1-34.

On June 28, 2012, IBEW initiated this action pursuant to the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to compel arbitration.  Docket No. 1 at 16-17, ¶¶ 60-65.  In the alternative, plaintiffs seek judicial resolution of their claim that PSCo breached the 2009-2014 CBA in violation of the LMRA.  Docket No. 1 at 17, ¶¶ 66-69. In addition, the Class Representatives assert claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, to preserve and recover

4

health benefits and to enforce rights under an employee welfare benefit plan.  Docket No. 1 at 2, ¶ 4, and 18, ¶¶ 70-71; 29 U.S.C. §§ 1132(a)(1)(B), (a)(3).

Plaintiffs have moved for judgment on the pleadings regarding the claim to compel arbitration.  Docket No. 20.  Defendants oppose this motion.  Docket No. 29.

## II.  STANDARD OF REVIEW

The Court reviews a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) much as it does a motion to dismiss pursuant to Rule 12(b)(6).  *See Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006) ("We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion.").  Accordingly, the Court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same."  *Id*.  To prevail, the moving party must show that "no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."  *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000).  As with motions pursuant to Rule 12(b)(6), the Court considers documents attached to the pleadings.  Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").

## III.  DISCUSSION

As courts may compel parties to arbitrate only those issues that they have contractually agreed to submit to arbitration, the threshold question of whether an issue is arbitrable is a question of law for the courts, and not the arbitrator, to resolve.

*Commc'n Workers of America v. Avaya, Inc.*, 693 F.3d 1295, 1300 (10th Cir. 2012).  In the labor relations context, a presumption in favor of arbitration applies, meaning that courts must compel arbitration of any dispute arising under a CBA unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. . . . Doubts should be resolved in favor of coverage." *Id.* (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  "In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where . . . the exclusion clause is vague and the arbitration clause quite broad." *United Steelworkers*, 363 U.S. at 584-85.

Courts are generally not to rule on the merits of the underlying claims when making an initial determination of arbitrability.  *Avaya*, 693 F.3d at 1300 (citing *AT&T Tech., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986)).  However, when the merits of a claim are bound up with the question of its arbitrability, "the court's duty to determine whether the party intended the dispute to be arbitrable trumps its duty to avoid reaching the merits." *Id.* (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 209 (1991)).

Employees' "wages, hours, and other terms and conditions of employment" are mandatory subjects of collective bargaining. 29 U.S.C. § 158(d).  However, in *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 167, 180 (1971), the Supreme Court held that, under the LMRA, benefits

6

of current retirees are not a mandatory subject of bargaining because retirees are not employees within the meaning of the NLRA.  The Court explained that, while the LMRA's use of the phrase "terms and conditions of employment" does not "immutably fix a list of subjects for mandatory bargaining . . . .  it does establish a limitation against which proposed topics must be measured."  *Id*. at 178.  It further explained that the phrase "terms and conditions of employment" generally excludes "matters involving individuals outside the employment relationship," except when such matters "vitally" affect the terms and conditions of employment for employees.  *Id*. at 179.  The Court noted that the future retirement benefits of current employees are "part and parcel of their overall compensation and hence a well-established statutory subject of bargaining."  *Id*. at 180; *see also NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 350 (1958) (holding that mandatory subjects of bargaining are those that "regulate[] the relations between the employer and the employees").  Although retiree benefits are not a mandatory subject of bargaining, they remain a permissive subject that parties may agree to submit to arbitration.  *See Allied Chem.*, 404 U.S. at 181 n.20 ("This does not mean that when a union bargains for retirees–which nothing in this opinion precludes if the employer agrees–the retirees are without protection.").

Plaintiffs allege that the current CBA (i.e., the CBA in effect from 2009 to 2014) provides healthcare benefits to both current and future retirees–including those who retired while previous CBAs were in effect–and that PSCo breached the CBA by unilaterally changing a provision of the healthcare plan.  Docket No. 1 at 16-17, ¶¶ 61-64; Docket No. 20 at 5-10.  They argue that this dispute falls within the CBA's arbitration clause and that there are no provisions explicitly removing retiree benefits

from the scope of that clause.  Docket No. 30 at 4.  They urge the Court to follow *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 540 F.3d 640 (7th Cir. 2008), and compel arbitration "because the CBA includes provisions that apply specifically to retirees" and "the CBA says that disputes over its interpretation or application are subject to arbitration."  Docket No. 20 at 9 (citing 540 F.3d at 644-45).

The court in *Exelon* held that the parties had agreed to arbitrate the issue of retiree benefits because the CBA "included terms according rights to retirees as well as a broad obligation to engage in arbitration over disputes about the CBA."  540 F.3d at 645.  Retiree medical benefits in *Exelon* were memorialized in Memoranda of Agreement Reached in Collective Bargaining, "which supplemented and became part of the CBA." *Id*. at 642.  The CBA's arbitration clause provided that "any dispute or difference [that may] arise between the Company and the Union or its members as to the interpretation or application of any of the provisions of this Agreement" would be resolved through the grievance procedure and arbitration.  *Id*. at 642.  The court noted that, where an arbitration provision is broad, "only an express provision excluding a particular grievance from arbitration . . . [or] the most forceful evidence of a purpose to exclude the claim . . . can keep the claim from arbitration."  *Id*. at 646 (quoting *AT&T*, 475 U.S. at 650) (internal quotation marks omitted).  *See also Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists & Aerospace Workers Local Lodge No. 1784*, 840 F. Supp. 2d 885, 892-93 (D. Md. 2012) (holding that a dispute regarding retiree benefits was subject to mandatory arbitration where the CBA included provisions for retiree benefits and contained "expansive" arbitration clause stating that "any dispute

8

concerning the interpretation or application of any of the provisions of this Agreement

. . . shall . . . be submitted to arbitration."); *United Steelworkers of Am., AFL-CIO v.*

*Canron, Inc.*, 580 F.2d 77, 79-82 (1978) (holding that parties had agreed to arbitrate

disputes over retiree benefits where the CBA's arbitration clause covered disputes

"between the company and the union or its members employed by the company as to

the meaning and application" of the CBA, the CBA provided for retiree benefits, and the

CBA referenced retirees who had retired before the current CBA took effect).

The court in *Exelon* also found that the CBA lacked any provision "clearly"

limiting the arbitration agreement to "disputes involving only current employees."  540

F.3d at 646.  Exelon argued that the following provisions explicitly excluded retiree

benefits from the grievance and arbitration procedure:

> "It is the intent of the Company, Local Union 15, and the *employees* that
> timely filed grievances shall be settled promptly" (emphasis added); the
> deadline for filing a grievance runs from the date that the "*employee* became
> aware or reasonably should have become aware of the incident which is the
> basis for the grievance" (emphasis added); and "[t]he dispute or difference
> shall be presented and first discussed by the *employee* concerned and the
> immediate Supervisor."  (Emphasis added).

*Id*. at 646.  The court rejected this argument, stating that none of the provisions

"expressly excludes from arbitration a grievance brought by the Union on behalf of

retirees."  *Id*.

The court in *Exelon* distinguished its previous decision in *Rossetto v. Pabst*

*Brewing Co.*, 128 F.3d 538, 539 (7th Cir. 2007), in which it held that Pabst could not be

compelled to arbitrate retiree benefits because the arbitration clause reflected that it

had not agreed to do so.  Although the *Pabst* CBA contained provisions concerning

retirees' health benefits, the arbitration clause was narrower than that in *Exelon*. *Id*. at 539. It provided arbitration only for "grievances or misunderstandings between the Company and its employees." *Id*. at 539. As retirees were not employees, and Pabst had only agreed to arbitrate disputes with employees, the union could not force Pabst into arbitration regarding retiree benefits. *Id*. at 541. *Rossetto* demonstrates that "the mere fact that a CBA creates the retirees' rights to medical benefits may be insufficient to establish that the company agreed to arbitrate disputes over retiree medical benefits." *Exelon*, 540 F.3d at 645.

In *Avaya*, the Tenth Circuit held that it was necessary to reach the merits of a dispute over whether certain employees (known as "backbone engineers") were managers, and therefore not subject to the terms of the CBA, in order to determine whether the dispute was arbitrable. 693 F.3d at 1301-02. The CBA contained a broad arbitration clause, stating: "[i]f, at any time, a difference arises between the Company and the Union regarding the true intent and meaning of a provision under [this Agreement], or a question as to the performance of any obligation hereunder," the grievance procedures would apply. *Id*. at 1297. A Neutrality Agreement, governing union organizing of non-management employees, was appended to the CBA. *Id*. at 1297-98. The Neutrality Agreement provided that disputes relating to organizing of non-management employees were subject to resolution by a third-party neutral. *Id*. at 1298. The union began a drive to organize the backbone engineers according to the procedures set out in the Neutrality Agreement and Avaya objected, arguing that the backbone engineers were not subject to the Neutrality Agreement and could only be

organized through the NLRB's procedures.  *Id*.  The union sought to arbitrate the

dispute and Avaya refused, asserting that it had never agreed to arbitrate disputes over

organizing managers.  *Id*. at 1298-99.

The Tenth Circuit held that the backbone engineers were management

employees.  *Id*. at 1301-02.  It then held that there was "forceful evidence" that the

parties never agreed to submit disputes regarding backbone engineers to arbitration

since the Neutrality Agreement explicitly applied only to "disputes arising from

organizing drives directed at 'non-management employees.'"  *Id*. at 1302.  As the

dispute in *Avaya* did not arise under the CBA or the Neutrality Agreement, the court

held that it fell outside the arbitration clause.  *Id*. 1302-03.

In *Printing Specialties & Paper Prods. Union Local 680, Graphic Commc'n Int'l

Union, AFL-CIO v. Nabisco Brands, Inc.*, 833 F.2d 102 (7th Cir. 1987), the court found

that the arbitration clause was broadly framed, but nonetheless affirmed the denial of

the union's motion to compel arbitration of a dispute regarding whether certain workers

were entitled to participate in the early retirement program described in the pension

plan.  The court based its conclusion on a finding that the CBA did not incorporate the

pension plan and thus that employees could not use the CBA's grievance resolution

procedure to enforce the terms of the pension plan.  *Id*. at 105.  The CBA's arbitration

clause covered "any grievance or misunderstanding involving wages, hours, or working

conditions which any employee may desire to discuss and adjust with the Company."

*Id*. at 103.

The CBA in *Nabisco Brands* also stated that "[t]he Company agrees to continue

11

its present Pension Plan in full force and effect for the term of the agreement." *Id*.  The

court held that this reference to the pension plan did not establish that the parties had

agreed, as a result of negotiation, to include the pension plan in the CBA. *Id*. at 105.

On the contrary, the court noted that, according to the evidence, Nabisco had refused

to discuss the pension plan during the most recent CBA negotiation. *Id*.  In addition,

Nabisco had offered to institute the pension plan before the union organized its

employees and thus it was not a result, at least initially, of bargaining between the

parties. *Id*.  Finally, the pension plan included its own process for administering

grievances that was separate from the grievance procedure in the CBA. *Id*.  Taken

together, the court found there was forceful evidence that the pension plan was

"separate and distinct" from the CBA and that "the disputed Pension Plan benefits were

never intended to be arbitrable between the parties under the provisions of the

collective bargaining agreement." *Id*.  The court noted that it might have reached a

different conclusion had Nabisco "failed to fulfill an obligation under the collective

bargaining agreement which abrogated the full force and effect of the Pension Plan,

such as failing to fund the Plan adequately or eliminating the Plan altogether." *Id*.

    The court followed through on its hypothetical in *Local 232, Allied Indus. Workers*

*of Am., AFL-CIO v. Briggs & Stratton Corp.*, 837 F.2d 782, 787 (7th Cir. 1988), where it

affirmed a grant of summary judgment to a union seeking to compel arbitration of the

company's unilateral changes to the retirement plan.  The CBA provisions at issue were

similar to those in *Nabisco*, but the court noted that "[i]n *Nabisco* the pension plan itself

was not altered by the sale of one of Nabisco's plants. . . . in contrast to Nabisco, Briggs

& Stratton actually altered the terms of the retirement plan."

The grievance and arbitration provisions here are similar to those at issue in

*Nabisco Brands*.  *See* 833 F.2d at 103.  Article 21 sets forth the grievance procedure:

> The purpose of this Article is to provide a procedure for prompt, equitable and common sense adjustment of alleged grievances relating to hours, wages or conditions of employment as covered by this Agreement. . . .  Any alleged grievances relating to matters covered by this Agreement shall be processed in the following manner: . . . .

Docket No. 1-36 at 2, §§ 2, 4(c).  Article 22 contains the arbitration agreement:

> In the event a dispute, a misunderstanding, or controversy shall arise between the parties hereto during the life of this Agreement or during any extension or renewal of this Agreement relating to hours, wages, or conditions of employment, as covered by this Agreement, which shall not be settled through the grievance procedure, then, and in that event, the Company and Union shall each select an arbitrator . . . .

Docket No. 1-36 at 5.  Defendants argue that, following *Allied Chemical*, the phrase

"hours, wages or conditions of employment" is a term of art referring only to mandatory

subjects of bargaining, which do not include retiree benefits.  Docket No. 29 at 11-12;

*see Allied Chem.*, 404 U.S. at 164.  Plaintiffs counter that *Allied Chemical* limits only the

meaning of the term as used in the NLRA and does not mean that retiree benefits are

"not a 'condition of employment as covered by this Agreement' if they [have] been the

subject of bargaining."  Docket No. 30 at 7.

As the CBA was negotiated by sophisticated parties who were surely aware of

the background legal landscape, *Allied Chemical* is evidence that the parties agreed to

arbitrate only disputes related to mandatory subjects of bargaining.  However, a

contract is above all a creature of intent and thus it is possible that the parties agreed to

give this term a broader meaning than it has in a statutory context.  *See Int'l Union,*

13

*United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).  This possibility is supported by the fact that other courts have held that this language is quite broad.[2]  *See, e.g.*, *Crown Cork & Seal Co., Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 501 F.3d 912, 915 (8th Cir. 2007).  Thus, *Allied Chemical* is not, on its own, "forceful evidence" that the parties intended to exclude retiree benefits from arbitration.

Defendants argue that Article 1 of the CBA explicitly removes retiree benefits from arbitration.  Docket No. 29 at 11-12.  Article 1 recognizes IBEW as the exclusive representative of employees and defines the scope of the bargaining unit.  Docket No. 29-1 at 2.  It states that "[t]his Agreement shall apply only to employees of the Company described in Section 1 of this Article, and shall embody general working rules, hours of work, rates of pay, grievance procedure, method of arbitration, and other conditions of employment as hereinafter outlined."  Docket No. 29-1 at 2-3, § 3.  It limits the definition of "employee" to "employees included in the bargaining unit . . . unless otherwise noted herein."  Docket No. 29-1 at 2, § 2.

The Court agrees with defendants that Article 1 constitutes forceful evidence of an intent to exclude benefits of employees who retired under past agreements from the

---

[2] Plaintiffs argue that the order in *Pub. Serv. Co. of Colo. v. Int'l Bhd. of Elec. Workers, Local Union No. 111*, No. 93-K-2127 (D. Colo. Dec. 1, 1993) [Docket No. 34-1] controls.  Docket No. 20 at 7.  In that case, the court granted IBEW's motion to dismiss PSCo's complaint for breach of the CBA on the ground that the dispute–which involved IBEW's involvement in a strike–was subject to arbitration.  The court found that PSCo had failed to produce evidence showing a "clear, unambiguous exclusion" of the dispute from the arbitration clause.  *Id*. at 5.  However, the former case is distinguishable from the case at hand because it did not involve the arbitrability of retiree benefits.

14

provisions of the current CBA, including the arbitration clause.  This clause operates as

did the language in *Rossetto* to limit the grievance and arbitration procedure to disputes

between employees and the company.  *See* 128 F.3d at 539-40 (holding that an

arbitration clause allowing "appeal to arbitration of 'all grievances or misunderstandings

between the Company and its employees'" did not indicate that Pabst had agreed to

arbitrate disputes over retiree benefits).

Defendants also argue that the term "retirees," as used in the CBA, refers only to

employees who retired under the current CBA and not under expired CBAs.  Docket

No. 29 at 9.  For example, Article 11 of the CBA, which covers "Other Employee

Benefits," provides in a subsection on Medical Insurance that:

> Retirees' and future retirees' and their dependents' health care benefits will
> be provided according to the terms of the Retirees' Medical Managed
> Care/Medicare Coordinated Plan (M/M).   Future plan changes in the
> Managed Health Care Plan will also be reflected in the retiree plan for
> individuals under age 65.  These changes do not affect the medical coverage
> of retirees with Medical plans other than (M/M).

Docket No. 29-1 at 5, § 3(a).  Plaintiffs argue that at the time the 2009 CBA went into

effect, there were no employees who had retired under the current CBA, and thus the

term must refer to employees who retired under past CBAs.  Docket No. 30 at 1-2.  The

Court finds defendants' contention on this point to be more persuasive.  If plaintiffs'

interpretation were correct, then all retirees would be eligible for the M/M Plan when, in

fact, only those who retired after 1990 participate in the M/M Plan.  Docket No. 1-20 at

20 ("If you were a regular full-time employee of the Company . . ., and you retired after

January 1, 1990, you are eligible to participate in the Retiree's Medical Managed

Care/Medicare Coordinated Plan.").

Other language in the CBA reinforces the conclusion that the term "retirees" was not used to refer to past retirees.  Article 11 of the CBA states that "[r]etirees' monthly contribution for coverage under (M/M) will be determined at time of retirement in accordance with the following cost sharing schedule."  Docket No. 29-1 at 5, § 3(d).  Plaintiffs admit that this language applies only to future retirees.  *See* Docket No. 1 at 10, ¶ 40 (stating that identical language in the 2003-2006 CBA constitutes a "new schedule for increasing retiree premium cost-sharing for future retirees"); Docket No. 1-22 at 3.  In addition, plaintiffs do not dispute that past retirees are not subject to the cost schedule set forth in the current CBA:

> Agreement that the benefits of then-current retirees would not be affected by the transition to the M/M demonstrates bargaining over those benefits in 1989-'90.  The fact that the benefits for existing retirees have always been agreed to be fixed as of the time of retirement is **why** the forward-looking changes . . . were never applied to people who had already retired.  To the extent that this history shows bargaining over M/M benefits for all retirees, it also supports arbitrability.

Docket No. 30 at 5, n.6 (emphasis in original).  While this history may show bargaining over retiree healthcare benefits, it also shows that the term "retiree," as used in Article 11 of the CBA, does not refer to people who retired under previous CBAs since the changes described do not apply to those retirees.  Plaintiffs do not cite any other language in this CBA, or in previous CBAs, that reflects an agreement to arbitrate retiree health benefits.

In sum, there is forceful evidence that the parties did not agree to arbitrate the healthcare benefits of current retirees who retired under past CBAs.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiffs' Motion for Judgment on the Pleadings and on First

Claim for Relief, and Motion to Stay Proceedings Pending Arbitration [Docket No. 20] is

DENIED.

DATED May 2, 2013.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge